HONORABLE RONALD B. LEIGHTON

1

2

3

4

5 UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
6 AT TACOMA

7
UNITED STATES OF AMERICA, on its
8 own behalf and as trustee on behalf of the
Lummi Nation,

Case No. C01-0809 RBL

9
Plaintiffs,

ORDER

10
v.

11 KEITH E. MILNER and SHIRLEY A.
MILNER,
12
Defendants.
13 _____

14 UNITED STATES OF AMERICA, on its
own behalf and as trustee on behalf of the
15 Lummi Nation,

16 Plaintiff,

17 v.

18 MARY D. SHARP,

19 Defendant.
_____
20 UNITED STATES OF AMERICA, on its
own behalf and as trustee on behalf of the
21 Lummi Nation,

22 Plaintiff,

23 v.

24 BRENT C. NICHOLSON and MARY K.
NICHOLSON,
25
Defendants.
26 _____

27

28

ORDER
Page - 1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES OF AMERICA, on its
own behalf and as trustee on behalf of the
Lummi Nation,

               Plaintiffs,

     v.

HARRY F. CASE,

               Defendant.
_____

UNITED STATES OF AMERICA, on its
own behalf and as trustee on behalf of the
Lummi Nation,

               Plaintiff,

     v.

IAN C. BENNETT and MARCIA A. BOYD,

               Defendants.
_____

UNITED STATES OF AMERICA, on its
own behalf and as trustee on behalf of the
Lummi Nation,

               Plaintiff,

     v.

DONALD C. WALKER and GLORIA
WALKER,

               Defendants.
_____

THE LUMMI NATION,

               Intervenor-Plaintiff.

## INTRODUCTION

       This matter is before the court to determine the appropriate remedy for Defendant Nicholson's violation of the Clean Water Act.   The case involves shore defense structures located on the water side of private residences along the western shore of Sandy Point in Whatcom County, facing the Strait of Georgia.  Although Sandy Point is located within the Lummi Reservation, the property on Sandy Point above the Mean High Water Line ("MHWL") was sold by the Lummi Nation and developed some time ago.  Sandy Point is now a community of privately owned permanent and vacation homes.  The private

1  owners also own and operate for their own benefit a golf course and marina on the Point.  The United

2  States retains ownership of the tidelands, up to the MHWL, and holds them in trust for the Lummi Nation.

3       The owners of the upland properties previously enjoyed a lease of some or all of the tidelands

4  surrounding Sandy Point.  That lease expired in 1988.  Over time, both before and after the expiration of

5  the lease, most of the owners of upland residences built various shore defense structures to protect their

6  property from the erosive and destructive impacts of the force of wind and waves.  These shore defense

7  structures generally consist of "riprap" (large rocks and boulders fronting the property), and/or sea walls

8  (timber or concrete retaining walls).

9       After the lease expired, and negotiations regarding a new lease broke down, the Lummis began

10 asserting their ownership interest in the tidelands and beach up to the MHWL.  Eventually, the United

11 States brought suit against eight waterfront owners, alleging that their shore defense structures were

12 located below (toward the water) of the MHWL, and were therefore trespassing on the Lummi's property.

13 They also claimed that the structures were constructed without appropriate permits from the United States

14 Army Corps of Engineers. Two federal laws were implicated and cited: Section 10 of the Rivers and

15 Harbors Act, which prohibits filling of navigable waters (defined as those waters below the MHWL), and

16 Section 404 of the Clean Water Act, which prohibits "discharge" (including fill or shore defense structures)

17 below the Mean Higher High Water Line ("MHHWL") without a permit.

18      The case was originally assigned to Judge Barbara Rothstien.  She heard and resolved a variety of

19 dispositive motions, as described below.  For reasons that remain somewhat unclear, the United States'

20 actions against all but one of the defendants have either been settled or held in abeyance, although the

21 docket does not reflect that any of them have been dismissed from the case. In any event, Judge Rothstein

22 found that a portion of Defendant Brent and Mary Nicholson's shore defense structure trespassed on the

23 Lummi land, and was located below the relevant lines of jurisdiction under the Rivers and Harbors Act and

24 the Clean Water Act.  This court held a hearing to determine the appropriate remedy for the Clean Water

25 Act violation.

**PRIOR COURT ACTION**

27      This case was transferred to this court on August 25, 2003.  Prior to transfer, Judge Rothstein

28 resolved all liability issues concerning the Nicholson defense structure as it currently exists.  Specifically,

1  on January 24, 2003, the court determined as a matter of law that the beach on Sandy Point has

2  continuously been subject to erosion and accretion, and not to avulsion, and that as a result the tidelands

3  boundary always remained ambulatory.  (Dkt. #195)  On February 11, 2003, the Court ruled (1) that

4  artificial defense structures "that are not otherwise authorized," do not arrest the landward movement of an

5  ambulatory water boundary, and (2)  that the tideland ownership boundary is marked by the intersection

6  MHWL and the shore "as it would be located but for the presence of artificial structures."  (Dkt. #218)

7       On May 30, 2003, the court decided that the Army Corps of Engineers' jurisdiction under the

8  Clean Water Act extended to the intersection of the high tide line with the shore as it would exist "but for

9  the preexisting revetment and shore defense structures."  (Dkt. #253)  The court acknowledged that it was

10  the policy and practice of the Corps in the Seattle District to limit their jurisdiction to MHHWL.  The court

11  determined that a violation of Section 404 of the Clean Water Act had occurred and that a hearing should

12  be held to determine an appropriate remedy.

13       Finally, on June 18, 2003 Judge Rothstein adjudged the Nicholsons and owners of three

14  neighboring properties to be liable for trespass and for violating violation of Section 10 of the Rivers and

15  Harbors Act, inasmuch as the shoreline defense structures were, at least in part, waterward of the

16  intersection of MHWL and the shore in its natural and unobstructed condition.  (Dkt. #261)  The court

17  ordered the defendants to promptly remove all rock, riprap, and other shore defense structures located

18  seaward of MHWL as that line is determined on the government's January 2002 survey.  The court also

19  ruled that as MHWL migrates east (due to additional erosion), the defendants shall promptly, at the request

20  of the government, remove all rock, riprap, and other defense structures that become seaward of MHWL,

21  as determined by subsequent surveys.

22       On August 11, 2004, this court stayed enforcement of the court's Order pending appeal, upon the

23  condition that the defendants pay to the Lummi Nation the fair market value of the land under the

24  encroachment as compensation for the continuing trespass.  (Dkt. #280).

25       On March 28-31, 2005, this court held a hearing, in the form of a bench trial, on the remaining

26  issue of the remedy to be imposed for the Clean Water Act violation previously found by Judge Rothstein.

27

28

ORDER
Page - 4

Based on the evidence admitted in that trial,[1] the argument of the parties, and the record in this case, the court makes the following Findings and Conclusions:

### FINDINGS OF FACT

1.      Defendants Brent C. Nicholson and Mary K. Nicholson are husband and wife.

2.      In 1988, the Nicholsons purchased a parcel of residential real property located at 4093 Sucia Drive, Ferndale, Washington.  The residence is located on the Sandy Point Peninsula in Whatcom County.  Attached to the property is a four bedroom, three bathroom, single family residence which was originally constructed in 1964.  The house sits on low bank waterfront and commands an unobstructed view of the Strait of Georgia.  The tidelands waterward of the Nicholsons' property, commencing at the intersection of MHWL and the beach, are owned by the United States and are held in trust for the people of the Lummi Nation.

3.      In 1982, Dennis Beeman, the Nicholsons' predecessor in interest, installed in two phases a concrete bulkhead wall waterward of the residence on the property.  First, he built the lower portion of the wall by excavating a trench on the West side of his property from the South lot line to the North lot line, sidecasting on both sides of the trench, and pouring concrete into wooden forms.  Later that same year, he built the upper portion of the wall on top of the lower portion that had already been built.  Unlike the lower portion, the upper portion did not extend all the way to the property line on the North.  Instead, before the property line on the North was reached, it took a 90 degree turn to East for some distance in order to create an area for access to the beach.  Mr. Beeman used fill to raise the elevation of his yard behind the bulkhead wall.  Mr. Beeman did not survey his property before performing this work and although he did not have any actual knowledge of the location of MHWL or MHHWL, he believed his structure was outside the jurisdiction of the Army Corps of Engineers because it was landward of where most tides stopped and it was landward of more than minimal vegetation along the beach.  (See Exh. 360, photo 93 P) For this reason, Mr. Beeman did not seek a permit from the U.S. Army Corps of Engineers for any of this work.

4.      In 1982, the Lummi Nation claimed the vegetation line as the landward boundary of

---

[1]The parties' various motions to strike and exclude are DENIED.  The court considered and gave appropriate weight to all of the evidence, both testimonial and documentary, presented at the hearing.

1  tidelands which they owned.

2      5.      In December 1982, the wall which Mr. Beeman built only months before suffered

3  considerable damage from wind-driven waves in a winter storm.  Almost the entire upper portion of the

4  Western wall was destroyed.  The Northwest corner of the wall remained relatively intact.

5      6.      Thereafter, on August 9, 1983, Mr. Beeman had large riprap (rock) barged in from Lummi

6  Island.  The date and time was chosen by the barge operator to provide the highest expected tide so that

7  the rock could be unloaded as high on the beach as possible.  The rock was loaded in the back of the barge

8  so that the barge would tip up toward the land.  The barge was unloaded by using a front end loader that

9  extended from the eastern edge of the barge across the water to place the rock just waterward of the

10 remaining bottom half of Mr. Beeman's wall.  Exh. 360 (93 Z).

11     7.      The riprap was discharged from the barge waterward of the high tide line.  It was then

12 stacked over the remaining portion of the "Beeman" wall.  On May 30, 2003, this Court ruled that the high

13 tide line is the landward line of the Corps' jurisdiction under the Clean Water Act (Dkt. #253).  At the time

14 of the work, however, the Corps' written policy and practice was that its jurisdiction extended landward

15 only to the Mean Higher High Water Line, a line seaward of the "high tide" line.  Although Mr. Beeman

16 failed to obtain a permit from the Corps for this discharge of material, the Corps now concedes that it was

17 unlikely that in 1982-1983 it would have required a Section 404 permit for the Beeman wall or revetment.

18     8.      In 1988, the Nicholsons purchased the property from Mr. Beeman and his former spouse.

19 Soon thereafter, when a dispute arose between the Lummi Nation and the owners of the uplands properties

20 concerning the use of the Lummi tidelands without the permission of the Lummi Nation, the Nicholsons

21 learned that their property rights did not encompass the tidelands waterward of their residence.  This

22 dispute was touched off by the 1988 expiration of a global lease between the Lummi Nation and the

23 original Sandy Point land developer.  After the lease expired, the Lummi Nation posted "No Trespassing"

24 signs along the beach.

25     9.      Until 1987, the revetment placed in front of the Nicholsons' property by Mr. Beeman in

26 1983 remained relatively unchanged.  However, at various times during the course of the next several

27 years, the Nicholsons added rock to the revetment waterward of their property.  On an unknown date or

28 dates prior to 1996, the Nicholsons added an unknown quantity of new riprap in the area of the waterward

toe of their revetment.  The Nicholsons also paid someone driving a frontloader on the beach to pick up riprap that had fallen waterward from their revetment and place it back on top of the structure.  The Nicholsons did not have the permission of the United States or the Lummi Nation to conduct any of this work.

10.     In 1990, without a permit from the Army Corps of Engineers, Mr. Nicholson repaired the northwest corner of what remained of the top half of Mr. Beeman's wall.  However, there is insufficient evidence that this work was done within the Corps' jurisdiction.

11.     In the winter of 1995-1996, a significant storm again hit the Sandy Point Peninsula, sending wind-driven waves over the top of the Nicholsons' revetment and depositing a large quantity of driftwood into their yard.

12.     In 1996, the Nicholsons were involved in extensive remodeling of their home and they decided to build a concrete bulkhead behind the riprap which was placed by Mr. Beeman.  The purpose of the bulkhead was to protect their home and yard from storm damage.  Exh. 392 at 5.  The impact of storms can be seen in Exh. 312 (WDP 0072 to 77), 360 (93T through 93X).

13.     Sometime in the summer of 1996, the Nicholsons engaged W.D. Purnell and Associates, Inc., of Bellingham, to act as their agent for the purpose of obtaining the permits needed to erect a bulkhead wall within their existing revetment.  The Nicholsons wanted a tall bulkhead wall which would afford them greater protection from storm-driven waves like those that washed over their property the previous winter.

14.     Robert P. Bailey was assigned to be the project manager on the Nicholson project for W.D. Purnell and Associates.  Early on, Mr. Bailey determined that in order to build the bulkhead wall as far waterward as they wished the Nicholsons would need a variance from a Whatcom County requirement that structures be located no closer than 20 feet landward of the ordinary high water mark ("OHWM").  On July 15, 1996, Mr. Bailey took measurements at the Nicholson property and conducted a level loop survey for the purpose of determining proposed dimensions and elevations for the proposed structure.  From these measurements, a set of drawings were produced which, when finalized, were to be submitted to the Whatcom County Planning and Development Services Department and other agencies in support of the Nicholsons' application.

15.     Since at least the 1950s, the Sandy Point Beach has been subjected to erosion.  Mr. Beeman testified that from the time he built his wall and revetment to the present time, the elevation of the beach in the vicinity of the Beeman-Nicholson property dropped 8 to 10 feet.  This testimony was corroborated by photos and other evidence.  The exact elevation of the beach changes seasonally, or even more frequently.  With these changes, the location of the intersection of the MHWL and the beach also varies.  The overall trend is that the landward boundary of the Lummi property (defined by the MHWL), the landward line of Corps jurisdiction under § 10 of the Rivers and Harbors Act (also defined by the MHWL) and the landward line of Corps jurisdiction under § 404 of the Clean Water Act (MHHWL) all moved landward (easterly) over time.

16.     Although the location of the intersection of MHWL and MHHWL with the beach varies, these elevations are constants.  At Sandy Point, MHW is 8.25 feet and MHHWL is 9.1 feet above mean lower low water (MLLWL), which is 0.0 feet.

17.     On or about November 14, 1996, W.D. Purnell and Associates, Inc. submitted the plan view diagram with other materials to the Whatcom County Planning and Development Services Department, Land Use Division, in furtherance of the Nicholsons' application for a "Shoreline Variance Permit."  As noted above, the variance sought by the Nicholsons would enable them to build their shore defense structure immediately behind the Beeman revetment without regard to the otherwise applicable 20 foot Whatcom County setback requirement.

18.     Mr. Bailey did not apply for a permit from the U.S. Army Corps of Engineers on behalf of the Nicholsons.  He did not investigate whether a Corps permit was required, and he did not communicate with the Corps.

19.     In a letter dated November 27, 1996, Mr. Nicholson was advised by Whatcom County that he had submitted what it deemed to be a complete application.  He was also advised that his project might fall under the jurisdiction of other agencies, including the U.S. Army Corps of Engineers.

20.     On December 11, 1996, and December 20, 1996, a public notice concerning the Nicholsons' application for a shoreline variance permit, prepared by Whatcom County, was published in the Bellingham Herald.  It stated in part:

> This project may also require the following permits: a Building Permit, a Fill and Grade Permit, a Hydraulics Project Approval and an Army Corps of Engineers Permit.

ORDER
Page - 8

21.     On or about February 19, 1997, the Corps sent a letter directly to Mr. Nicholson advising him of the possible applicability of Section 10 of the Rivers and Harbors Act and Section 404 of the Clean Water Act to his project.  The letter provided the name and telephone number of a person at the Corps who Mr. Nicholson could call "concerning specific permit requirements."  Enclosed were a permit pamphlet and necessary application materials.  Mr. Nicholson received this letter.  However, he did not contact the Corps to get more information about the requirements of the Clean Water Act, and he did not transmit this letter to Mr. Bailey or otherwise inform Mr. Bailey that he had received this letter from the Corps.

22.     On March 24, 1997, after an administrative hearing to consider an objection lodged by the Lummi Nation to the Nicholsons' variance application, a Whatcom County Hearing Examiner granted the Nicholsons their variance with conditions.  Among the conditions imposed was that the Nicholsons obtain a building permit from the Whatcom County Department of Planning and Development Services based on an engineering design, that the bulkhead not be constructed below OHWM or on property of the Lummi people, and that the waterward-facing vertical face of the structure be sloped.  The County also allowed the Nicholsons to build their wall in line with the bulkhead wall of their neighbor to the south.  To be conservative, the Nicholsons actually built their wall approximately 5 feet landward from the OHWM and their southern neighbor's bulkhead wall.

23.     On June 3, 1997, Mr. Nicholson contacted Curtin Davidson, a structural engineer, and requested that Mr. Davidson "engineer a retaining wall" for him.  Mr. Nicholson requested that Mr. Davidson design a wall that was approximately 7.5 feet in height and two feet higher than the existing wall built by Dennis Beeman at the Northwest corner of the property.  Mr. Nicholson did not inform Mr. Davidson of the conditions attached to the variance granted him by Whatcom County nor did he send Mr. Davidson any of the materials created by W.D. Purnell and Associates.

24.     Mr. Davidson went through two designs for the wall.  The first was rejected by Whatcom County because it did not comply with the terms of the variance.  The second, which was Exhibit 325, depicted a sloped wall 7.5 feet high, including a 2 foot footing.  It also depicted an additional amount of crushed gravel under the footing, the depth of which was to be determined in the field.  This plan was accepted and a building permit was issued.

25.     One of the contractors working on this project was Ronald Peterson.  Although he was not

1   doing the excavation, he was on site while the excavator was excavating the work area.

2       26.    While the excavator removed some riprap for a work area, most of the riprap remained.

3       27.    While the excavation was occurring, the top of the bottom half of the concrete wall built by

4   Mr. Beeman was exposed.  Since this interfered with the excavation and ability to compact gravel as

5   indicated in the plans, Mr. Peterson called Mr. Davidson who then came out to the site.  The excavator

6   dug a little deeper so that the sides of the visible strip of concrete could be exposed, whereupon they

7   learned that it was a concrete wall, leaning seaward.

8       28.    Mr. Davidson and Mr. Peterson conferred and it was decided that instead of placing

9   compact granular fill as indicated in the plans, lean concrete would be placed until it covered the top of the

10  old concrete wall.

11      29.    Mr. Peterson followed these revised plans by placing filter fabric in the bottom of the work

12  area and placed lean concrete until it covered the top of the old concrete wall.  While the exact depth of

13  this lean concrete is unknown, it is known that the maximum depth was 12 inches because Mr. Peterson

14  and his crew were working in the concrete with boots that are 12 inches in height.

15      30.    Once the concrete dried and hardened, Mr. Peterson built the forms for the concrete footing

16  directly on the lean concrete and then later formed and poured the wall.  Although Mr. Peterson did not

17  know the elevation of the top of the old wall built by Mr. Beeman, other testimony confirms that height.

18  When Mr. Beeman testified the second time, he explained that the bottom half of his concrete wall

19  extended all the way to the wooden railroad tie bulkhead owned by his neighbors to the North, the Sharps.

20  The top half did not extend that far.  He also testified that the entire length of that four foot wall was

21  essentially level.  Therefore, the height of the wall that remains between the Sharp and Nicholson

22  properties is essentially the height of the remaining part of the wall over which Mr. Peterson poured

23  concrete and built the footings for the Nicholson bulkhead.

24      31.    After construction of the wall was completed, the riprap that had been removed was placed

25  back on the preexisting revetment and in the area of excavation located immediately waterward of the new

26  bulkhead wall.  The construction of the improvements to the Nicholsons' shore defense structure took

27  approximately 30 days.

28      32.    The elevation of that old wall can be determined either by surveying it or measuring from

    another surveyed location such as the top of the bulkhead wall.  In 2002, PS&E surveyed the top of the

wall at 17.82. Mr. Nicholson has measured from the top of the bulkhead wall to the top of the old Beeman wall at 7.5 feet. This testimony indicates that the top of the old Beeman wall is at an elevation of 10.32 and the bottom elevation of any work done in this project is no more than 12 inches below that level, at 9.32 MLLWL. The finding that the sea wall portion of the Nicholson shore defense structure is located above the MHHWL is bolstered by the testimony of Kristia Tong of the Corps of Engineers, who clearly testified that the Corps' issue with the Nicholson structure related to the rip rap, and not to the wall. (Ex. A-17 at 72-76)

33.     In September of 2003, Mr. Nicholson hired Rodney Miller, a surveyor in the area, to survey the bottom of the concrete footing, the top of the footing and top of the wall. An area along the wall was dug and then the hole was extended eastward until the side of the footing could be found. They then dug to the bottom of the footing.

34.     Mr. Miller surveyed the top of the bulkhead wall at 18.06 MLLWL, the top of the footing at 12.20 and the bottom of the footing at 10.45. Exhibit 301. While Mr. Miller's survey of these elevations was criticized by Mr. Blair Prigge, these criticisms do not cause the court to conclude that Mr. Miller's surveyed elevations are inaccurate. They are generally consistent with the other evidence regarding the wall's elevation. Furthermore, and significantly, although the measurements are relatively easy to make, the government chose not to duplicate or contradict Mr. Miller's measurements.

35.     The elevation of the bottom of the bulkhead footing is also confirmed by the other data previously referenced, namely that the top of the old Beeman wall is 7.5 feet below the top of the new wall, which was surveyed at 17.82 feet.

36.     The Nicholsons' defense structure consisting of a riprap revetment with an adjoining seawall does not obstruct navigation.

37.     The Nicholsons' defense structure does not have serious environmental consequences. Wave energy is deflected by the riprap revetment. The riprap has positive benefits for the beach in reducing erosion because it tends to capture the sediments brought in from incoming waves so that they are not taken out with the out-flowing wave. In fact, it is likely that if the riprap revetment were removed, the bulkhead wall standing alone might actually have a greater effect on beach erosion.

38.     The Beeman/Nicholson defense structure was not within the jurisdiction of the Army Corps of Engineers, as exercised by the Seattle Division, at the time it was built (in 1982, 1983, and 1997). Over

time the beach continued to erode, eventually leading to portions of the revetment being intersected by MHWL and MHHWL. This occurrence results in a violation of Section 404 of the Clean Water Act as to that portion of the revetment waterward of MHHWL, and a violation of Section 10 of the Harbors and Rivers Act, and Trespass, as to that portion of the revetment waterward of MHWL.

### CONCLUSIONS OF LAW

1.      As the court has indicated to the parties, it is not inclined to re-visit prior rulings and orders entered in this case by Judge Rothstien during the time she presided over it. Therefore, the court's prior summary judgment (and other) rulings remain effective. These include, but are not limited to, the Order Denying the Defendants' Motion for Partial Summary Judgment on the effect of the Beeman/Nicholson wall on the movement of the boundary between the Lummi tidelands and the Nicholson property [Dkt. #218], and the court's ruling that the Nicholson revetment violates the CWA [Dkt. #253].

2.      That said, there is one aspect of a particular ruling with which the court does not agree, and that disagreement impacts the remedy to be imposed for the Nicholson's violation of the CWA. In her Order of May 30, 2003, Judge Rothstein ruled that the Corps' jurisdiction under the Clean Water Act extends to "the high tide line as it would be located but for the preexisting revetment and shore defense structures." [Dkt. # 253]. It is clear, however, that Corps jurisdiction in this state extends (only) to the MHHWL - a line that is waterward of the "high tide line." This has been the historic line of jurisdiction exercised by the Corps in Washington [See, for example, Ex. A-39], and the Plaintiff concedes that anyone who asked at any relevant time would have been so informed. This is an area of the law where the boundary line is physically in flux, and it is not reasonable for the regulator to compound that problem by informing the community it regulates that the law (its jurisdiction) extends to one line, and later, without notice and apparently in isolated cases, to assert jurisdiction and regulatory enforcement to a different, more landward line. For this reason, the court will not enforce a remedy or penalty against the Nicholsons for that portion of their shore defense structure which is above the MHHWL.

3.      Under the CWA, once a violation is found, the court "shall" impose a penalty. The statutory maximum for a violation is $27,500 per day. The court has broad discretion to set a civil penalty for a violation of that Act. The court considers the following factors for determining the appropriate

remedy/penalty:

    (1)    seriousness of the violation or violations;

    (2)    the economic benefit (if any) resulting from the violation;

    (3)    any history of such violations;

    (4)    any good faith efforts to comply with the applicable requirements;

    (5)    the economic impact of the penalty on the violator; and

    (6)    such other matters as justice may require.

33 U.S.C. §1319(d).

    4.    The first factor – the seriousness of the violation – includes analysis of the number and duration of the violation(s), the importance of it to the regulatory scheme, and the environmental impact of the violation. *See,* for example, *United States v. Gulf Park Water Co.*, 14 F.Supp.2d 854 (S.D. Miss. 1998).

    5.    The offending structure has been in place, in some form or another, for more than 20 years. However, its presence is not analogous to contiguous dumping or repeated violations of the CWA. The offending structure is not akin to industrial pollutant dumping, or the Navy's bombing range in Puerto Rico (cited by the government). The court therefore concludes that the "number of violations" is one. The duration of the violation is measured by the time since the relevant jurisdictional line moved to the structure.

    6.    The Lummi's assertion of their rights over the tidelands is done in good faith. Similarly, the Government asserts the Corps' regulatory and enforcement jurisdiction for the protection of the environment under the CWA in good faith. However, the issue with the Nicholson shore defense structure is (or should be) only its location; not its size or aesthetic quality. Had the Nicholson shore defense structure been constructed much further inland, neither Plaintiff would be in a position to complain about it. The size and scope of the structure is more appropriately a matter for Whatcom County; it is not a factor in the seriousness of the violation. Instead, this factor is informed only by the location of the structure and its impact on the environment as the result of it (now) being partially waterward of the MHHWL. As the parties agree, the Beeman revetment was located in the same place as the Nicholson structure, and the Nicholson "riprap" is made up of the rocks Mr. Beeman imported in 1983. For the most part, the line has moved to the structure, not the other way around.

5.     The Corps' regulatory scheme is clearly directly impacted by the building of structures waterward of the MHHWL without the required permit.  It is not clear that structures which were lawfully constructed without a permit (because they were above the MHHWL when built) impact or jeopardize the integrity or purpose of the regulatory scheme.

6.     The impact of the wall on the erosion of the Sandy Point beach is disputed.  It is agreed that, in general, bulkheads and other shore defense structures that are in contact with the water, particularly during storm conditions, lead to beach scouring and erosion.  The Nicholson wall is designed to minimize this impact in two ways: it is sloped, not vertical, and it has riprap in front of it to diffuse the force of waves and to prevent material form being swept out into the water.  Additionally, there are generally shore defense structures north and south of the Nicholson property, and they all have an impact on the erosion on Sandy Point as well.  No witness pointed to any discernable impact of the Nicholson structure specifically, and no witness testified that the erosion would be any different if the Nicholson structure was either permitted or located further inland.  The environmental impact of the Nicholson shore defense structure relates only to erosion; it is not "polluting" in any sense other than its presence in below the MHHWL.  And its location is, again, very close to the jurisdictional line – a line that has moved toward that structure.  For these reasons, the seriousness of the violation, in comparison to the imposition of the statutory maximum, is minimal.

7.     The court concludes that the "economic benefit" to the Nicholsons in failing to seek and obtain a §404 permit is minimal.  It would cost no more than $2,000, which is dwarfed by the cost of defending this suit.

8.     The court finds that there is no history of any CWA violations or any other federal or state permits.  While the government argues that Mr. Nicholson (without a permit) moved rock that had fallen on the beach off the revetment fronting his property, there is no evidence that a permit was required for the actions taken at that time.

9.     The court does not specifically conclude that Mr. Nicholson attempted in good faith to comply with the Corps' permitting requirements.  Instead, the court finds that Mr. Nicholson actively sought to avoid implicating such requirements because he did not want to buy or lease the right to build a shore defense structure on Lummi Property.  Additionally, due to the transitory nature of the jurisdictional and proprietary boundaries, it is not clear what would have occurred had Mr. Nicholson sought the Corps'

advice with respect to the potential applicability of §404 of the CWA in 1996 or 1997.  It is also far from clear that this action would not have ensued, after the MHHWL moved east, even if the shore defense structure was permitted by the Corps when built.   Mr. Nicholson's good faith, or lack thereof, is not an influential factor on the facts of this case.

10.     With respect to the economic impact of the penalty on the violator, the parties have agreed that the penalty requested by the government ($100,000) would not bankrupt the Nicholsons.  However, the court should not and will not disregard the substantial cost the Nicholsons have incurred in defending this action.  This cost, along with the stress and uncertainty caused by this action, will have a deterrent effect on future violators of the CWA.

11.     The final factor is other matters in the interest of justice.  The court does not conclude, as the Nicholsons urge, that the Corps' jurisdiction and regulatory authority is so vague as to be unconstitutional.  Again, despite the multitude of possible measurements of the Corps' jurisdiction, it is clear that the line is the MHHWL.    Rather, the inherent uncertainty of that measurement[2] and the ambulatory nature of the line, along with the fact that the Nicholson structure is very close to the line even today, tip the balance of justice toward the Nicholsons.  Similarly, the court does not conclude that, for purposes of an equitable CWA enforcement action by the government, a five year limitations period applies.  However, the long delay in bringing this action, and the government's concession that even a properly permitted structure is subject to an enforcement action if the line moves to it, also tips the balance in favor of the Nicholsons.

12.     Based on the facts and factors considered above, the court concludes that a penalty of the magnitude sought by the government is not warranted.  The Nicholsons have already been ordered to remove a portion of their structure, pending appeal, and the court is ordering further injunctive relief below.  Because this injunctive relief also imposes a significant financial obligation on the Nicholsons, the court orders a penalty payment for the CWA violation of  $ 1,500.00

---

[2]It is also not clear as to which version of MHHWL should be used.  Although the government has used 9.1 feet as MHHWL measured at Cherry Point, the government's witnesses agreed that 8.97 feet, measured at the secondary Sandy Point station, would be appropriate.  Based on the evidence, the court concludes that 9.1 feet is the appropriate measurement.

13.     The remaining issue is injunctive relief.   The court concludes that a portion of the Nicholson revetment is currently located below, or waterward, of the MHHWL.  It is not permitted by the Corps under the CWA.  The Nicholsons are therefore ORDERED to remove the riprap which is located below the MHHWL as shown on the Government's 2002 survey, Exhibit A-40, unless and until they apply for and obtain an "after the fact" permit for keeping the riprap in place.  If and to the extent the Nicholsons can remove the portion of the riprap below MHW (i.e., that portion which is located on the tidelands owned by the Lummi Nation), the Corps will process the permit application for the material located  above MHW and below the MHHWL.  The court does not order the Nicholsons to remove their seawall, which is located above the MHHWL as measured by the 2002 survey conducted after the commencement of this action.

## REMEDY

Based on these Findings and Conclusions, the court in its discretion Orders as Follows:

(1)     The Nicholsons shall pay a penalty of $1,500.00 for their previously adjudicated violation of the Clean Water Act.

(2)     The Nicholsons shall, within 90 days of the date of this Order, remove the riprap which is located below the MHHWL as shown on the Government's 2002 survey, Exhibit A-40, UNLESS they apply for and obtain the necessary "after the fact" CWA permit from the Corps.  If an application is filed within 90 days of the date of this Order, this injunctive portion of the order will be stayed until 60 days after that application is ruled upon by the Corps.

(3)     This Order shall be stayed pending appeal of this final Order, on the condition that the Nicholsons continue to pay the Lummi Nation fair market value for their use of the tideland below MHWL.

Dated this 20th day of April, 2005.

RONALD B. LEIGHTON
UNITED STATES DISTRICT JUDGE